# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JULIE BEAVER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 09-cv-2257 (RCL)** |
| | ) | |
| **JOHN MCHUGH,** | ) | |
| **Secretary of the Army,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM OPINION

This is a Title VII case, involving allegations of national-origin discrimination by a federal employer—the Department of the Army.  Before the Court is defendant's Motion for Summary Judgment,  Def.'s Mot. Summ. J. [22], Feb. 11, 2011, and plaintiff's Cross-Motion for Partial Summary Judgment.  Pl.'s Cross-Mot. Summ. J. [21], Feb. 11, 2011.  Having carefully considered the motions, the oppositions, the replies, the entire record in this case, and the applicable law, the Court will grant defendant's Motion for Summary Judgment and deny plaintiff's Cross-Motion for Summary Judgment.  A review of the background of this case, the governing law, the parties' arguments, and the Court's reasoning in resolving those arguments follows.

## I.    FACTUAL BACKGROUND

Dr. Julie Beaver, plaintiff in this case, is a physician, born and educated in China.  Pl.'s SMF [21-10] ¶1.  In 2006, after working in various jobs across the United States, she applied for a statistician position with the Department of Clinical Investigations ("DCI") at the Walter Reed Army Medical Center.  Def.'s SMF [22-2] ¶6.  DCI is an organization that supports and conducts medical research for the benefit of the Medical Center's patients.  *Id.* ¶1.

Dr. Beaver speaks English with an accent.  Pl.'s SMF [21-10] ¶1.  In February 2007, DCI hired her over several other candidates, including a Korean who spoke with an accent and a few others who spoke English without an accent.  Def.'s SMF [22-2] ¶8.  The record shows that DCI is a diverse place when it comes to employment of foreign-born individuals, and it must be a common experience to hear English spoken there with an accent.  Three of DCI's four departments are led by persons from other countries, including persons from Taiwan, Egypt, and Jamaica.  *Id.* ¶¶3, 4.  25% of its employees are from outside of the U.S.  *Id.*  The position Dr. Beaver accepted was previously held by a person from Taiwan and a person from Nigeria, both of whom spoke English with an accent.  *Id.* ¶5.  Dr. Audrey Chang, who is herself Taiwanese and speaks English with an accent, hired Dr. Beaver knowing that she was from mainland China. *Id.* ¶9.

As a new federal employee, Dr. Beaver's position was probationary for the first year.  *Id.* ¶10.  Her position required frequent consultations with DCI's researchers, who would need her statistical expertise to carry out their research projects.  *Id.* ¶12.  Her position also required her to teach courses in statistics.  *Id.*  The position description created for her position reflects these expectations.  Among other duties, she was required to train and educate researchers in various areas, including in the application of statistical methods, the design of research projects, and the use of statistics software.  Def.'s Ex. 16 at 83, 83–84.  She was required to engage in consultations with researchers and to communicate and interpret those researchers' statistical results.  *Id.*

While employed by DCI, Dr. Beaver received some formal training to enhance her skills, at DCI's expense, including training on a software program used in statistical analysis.  Def.'s SMF [22-2] ¶15.  However, DCI does not offer English language training—nor any training, for

that matter, to acquire a skill that DCI expects its applicants to already possess at the time that it offers them a job.  *Id.* ¶16.

Several months passed without Dr. Beaver's teaching a statistics course.  However, in July 2007, she was scheduled to teach a course on the use of statistics software to a group of non-statisticians.  *Id.* ¶18.  As the date of that course approached, she had some concerns about her English language abilities, writing to Dr. Chang that her main concern was her pronunciation, and that she planned to practice her English with another DCI employee to prepare for her upcoming class.  *Id.*

At least for the first half of Dr. Beaver's probationary period, Dr. Chang provided a positive assessment of Dr. Beaver's work.  *Id.* ¶21.  Since this evaluation covered the period from when Dr. Beaver first began working for DCI (February 2007) to July 31, 2007, it may have included at least some consideration by Dr. Chang of Dr. Beaver's performance as a teacher in the course that began in July 2007, although the record is unclear.  *Id.*; *see* Pl.'s Ex. C [24-3] 1.  However, in August 2007, Dr. Chang performed another assessment specifically of Dr. Beaver's teaching skills, where she reported that Dr. Beaver "[n]eeds practical assistance" with respect to her "[a]bility to teach and communicate [] statistics to investigators."  Pl.'s SMF [21-10] ¶3.  Clearly the low ratings on this August 2007 assessment reflected Dr. Chang's concern that Dr. Beaver's communication skills were adversely affecting her performance as a teacher. Def.'s SMF [22-2] ¶20.

This poor assessment was followed by several months during which various DCI employees reported difficulties understanding Dr. Beaver.  One such person was Dr. Mary Klote, who was chair of the Clinical Investigations Committee ("CIC").  *Id.* ¶24.  One of Dr. Beaver's duties was to report to that committee on a regular basis.  *Id.*  Dr. Klote found Dr. Beaver's "accent" "very difficult" to understand.  *Id.*; Def.'s Ex. 19 at 136.  Dr. Klote's predecessor also

had "great difficulty understanding" Dr. Beaver.  Def.'s Ex. 1 [32-1] 1.  These two employees were not alone in having problems understanding Dr. Beaver.  For example, Dr. Klote received a report from Dr. Maureen M. Peterson, who also complained of having difficulty understanding Dr. Beaver.  Def.'s SMF [22-2] ¶¶32, 33.  Other employees reported similar problems to Dr. Chang and Colonel McQueen.  In October 2007, an investigator needing a statistical consultation told Dr. Chang that she couldn't understand Dr. Beaver, so Dr. Chang referred that investigator to DCI's other statistician.  *Id.* ¶25.  By November 2007, Dr. Klote told Colonel McQueen about Dr. Beaver's communication difficulties, and reported that other DCI employees had similar problems understanding her.  *Id.* ¶26.  By that time, Dr. Beaver had begun teaching another statistics course, so Colonel McQueen personally attended a class, and found himself unable to understand her.  *Id.* ¶27.

Dr. Beaver's course had seventeen students, and several of those students reported that communication problems interfered with their ability to learn.  In evaluations submitted at the end of the course, two students reported that she was an ineffective speaker; another noted that she "was very difficult to understand," *id.* ¶28; another wrote that her "accent, at times, [] interfer[ed] with my understanding of the information." *Id.*  Dr. Chang testified that she has never seen a DCI instructor rated so poorly on such evaluations.  *Id.*

At the request of Colonel McQueen, Dr. Chang polled other DCI employees about Dr. Beaver's communication abilities.  One person told Dr. Chang that it was "very hard and difficult to understand [Dr. Beaver]," and that "investigators just got lost." *Id.* ¶30.[1]  Others,

---

[1] Plaintiff objects to this evidence on hearsay grounds.  Pl.'s SMF [24-14] ¶30.  The Court overrules this objection, which misunderstands the hearsay rule.  Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).  The statement offered by defendant is not hearsay because it is not offered for its truth—*i.e.*, that the person who told Dr. Chang that he had problems understanding Dr. Beaver *actually had* problems understanding Dr. Beaver.  Rather, the statement is offered to show that others told Dr. Chang that they were having problems understanding Dr. Beaver.  For the same reasons, the Court also overrules Dr. Beaver's hearsay objections regarding the comments of Dr. Sarathi Komanduri and Dr. Arn Eliasson.  *See* Pl.'s SMF [24-14] ¶30.

including Dr. Sarathi Komanduri and Dr. Arn Eliasson, reported similar issues. *Id.* Dr. Chang also received reports that problems with Dr. Beaver's communication abilities were having an impact on DCI apart from the impact on the students in her courses. The workload of DCI's only other statistician, Robin Howard, had increased significantly because "several investigators returned to see [Ms. Howard] for statistical assistance after meeting with [plaintiff] unsuccessfully because of difficulty in understanding [plaintiff's] advice for their projects." *Id.* ¶31.

On January 4, 2008, near the end of her one-year probationary period, Dr. Beaver attended a meeting with Dr. Chang and Colonel McQueen, where she was informed that she would be removed from federal service because her communication abilities were below what was required for the job. Pl.'s SMF [24-14] ¶5. She later requested an extension of her probationary period so that she could enroll in an English language training program. *Id.* Although Colonel McQueen was initially receptive to Dr. Beaver's request, he looked into whether her probationary period could be extended under the applicable regulations, concluding that it could not. Def.'s SMF [22-2] ¶36. On January 29, 2008, Dr. Beaver again met with Colonel McQueen alongside Dr. Klote, where she requested English-language training, while also claiming that the Food and Drug Administration and the National Institutes of Health provide such training to their employees. Pl.'s SMF [24-14] ¶9. To this Dr. Klote replied, "we are not the FDA." *Id.* The next day, Colonel McQueen made the final decision to fire Dr. Beaver. *Id.* ¶10. It is undisputed that, while various persons involved in Dr. Beaver's termination made references to the unintelligibility of Dr. Beaver's "accent," no one said anything regarding her national origin. Def.'s SMF [22-2] ¶41.

On March 12, 2008, Dr. Beaver filed a formal complaint of discrimination with her agency. Def.'s Ex. 18 at 1. In a one-count charge, she alleged that she was discriminated against

by being terminated because she was Chinese.  *Id.*  Although her complaint contained a box that could have been checked if Dr. Beaver had alleged a discriminatory denial of training, only the "termination" box was checked.  *Id.* at 3.  There is nothing in the record indicating that Dr. Beaver ever sought to amend her administrative complaint to add a denial-of-training claim.

In August 2008, the Department of Defense's Civilian Personnel Management Service, Investigations and Resolutions Division, held a fact-finding conference concerning Dr. Beaver's complaint.  *See* Def.'s Ex. 19 at 98.  The investigator's comments during the conference confirm that the sole matter under investigation was "why the Complainant was terminated" and whether that termination was based upon national origin.  *Id.* at 117.  The investigator considered testimony from Dr. Beaver (who represented herself and asked questions of the other witnesses), Dr. Chang, Colonel McQueen, and Dr. Klote.  The transcript provided to the Court shows some passing references to Dr. Beaver's requests for English-language training, *see id.* at 114, but the focus of the conference was on Dr. Beaver's charge of discriminatory termination.  It must be noted that the transcript also provides insight regarding the question of whether Dr. Beaver actually had serious problems communicating in English, as the following selections from her testimony show:

> Q:      Okay.  How would you describe your relationship with Dr. Chang before that meeting?  Say up through September.
>
> A:      Everything since (indiscernible) no problem.  I do whatever she ask me to do and, and she happy about my work.  When I show her my (indiscernible) she said, Julie, all a good, all a good point.  And in fact, in April and Dr. Chang told me, Julie (indiscernible) chief of biometrics (indiscernible).  I would like you to training become a chief of biometric (indiscernible).  So you know I'm -- so I e-mail to my former supervisor, Dr. Morris . . . in MD (indiscernible).  I said (indiscernible) and she said she going to train me as a chief.  I told Dr. Morris, I'm not interested in any chief.  I said (indiscernible) to do my job, promoted GS-14.  I have, I have the e-mail also.

*Id.* at 111.

Q:      . . . When you first started working here, your standards said that you would do about 200 consultations, is that right, statistical consultations?

A:      Not 200.  (indiscernible) the PI can come to me at least one time, one through five times.

Q:      Uh-huh.

A:      The project, project, not the, not the, not the -- Dr. Chang (indiscernible) to come consultation come.

Q:      Okay.

*Id.* at 116.  These exchanges are typical of Dr. Beaver's testimony during the fact-finding conference.

After this conference, the investigator found in favor of defendant.  Dr. Beaver then enlisted the assistance of counsel, and pursued an appeal of the investigator's determination, requesting a hearing before an administrative judge of the Equal Employment Opportunity Commission ("EEOC").  Following some discovery, and the denial of the parties' cross-motions for summary judgment, the administrative judge scheduled an evidentiary hearing.  However, in November 2009, Dr. Beaver notified the EEOC of her election, pursuant to 29 C.F.R. § 1614.407(b), to file a lawsuit in federal court.

Ms. Beaver brought suit in federal court that same month.[2]  Compl. [1] 1, Nov. 25, 2009. Her Complaint contains two counts.  Count I is for discriminatory denial of training in violation of Title VII.  *Id.* at 6.  Count II is for discriminatory discharge.  *Id.* at 7.  With respect to her discriminatory discharge claim, Dr. Beaver alleges that defendant discriminated against her by removing her from federal service without adequately determining whether her "manner of speaking, or her linguistic characteristics, materially interfered with her job performance" and despite the fact that her "linguistic characteristics did not materially interfere with her job performance."  *Id.* at 8.  Defendant never filed a motion to dismiss, and the parties' summary-

---

[2] In October 2011, this case was transferred by consent from the Honorable Beryl A. Howell to this Court.

judgment motions were ripe for decision at the time that the case was transferred to this Court in October 2011.

## II.    STANDARD OF REVIEW

The Federal Rules of Civil Procedure state that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The standard requires more than the existence of *some* factual dispute: "the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (1986).  A fact is material if, under the applicable law, it could affect the outcome of the case.    *Id.*    A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  Also, because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

A non-moving party, however, must establish more than "the existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  Furthermore, it may not rely solely on allegations or conclusory statements.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). To avoid summary judgment, the non-moving party must present specific facts that could enable a reasonable jury to find in its favor.  *Id.*  However, if the evidence presented is "merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249–50.

## III.   THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT

### A.  Legal Standards

### 1.  Title VII

Under Title VII of the Civil Rights Act of 1964, it is an "unlawful employment practice" for employers "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a)(1).   Ordinarily, courts examine Title VII claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S 792 (1973).   However, where (as here) an "employer has asserted a legitimate, non-discriminatory reason for the decision, . . . the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, sex, or national origin . . . ."   *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

A Title VII plaintiff has the burden of proving that the defendant's proffered non-discriminatory reason for the employment decision is a pretext.   *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 654 (D.C. Cir. 2003).   This burden can be met by, *inter alia*, showing that the reason offered by the defendant is false, or by presenting sufficient evidence to permit a reasonable fact-finder to conclude that the employer's proffered explanation is "unworthy of credence."   *Beyah v. Dodaro*, 666 F. Supp. 2d 24, 32 (D.D.C. 2009) (citing *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008) and *Desmond v. Mukasey*, 530 F.3d 944, 962 (D.C. Cir. 2008)).   A plaintiff may also "produce evidence suggesting that the employer treated other employees . . . more favorably in the same factual circumstances . . . ."   *Brady*, 520 F.3d at 495.   However, when the employer's proffered explanation is reasonable in the light of

the evidence, "there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts, and summary judgment is appropriate." *Beyah*, 666 F. Supp. 2d at 32 (citations and quotations omitted).

**2. Exhaustion of administrative remedies**

A federal employee who believes that her agency discriminated against her in violation of Title VII must seek administrative adjudication of her claim before filing suit in federal court. *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010); *see* 42 U.S.C. § 2000e-16(c). "A party must exhaust [her] administrative remedies within the Title VII limitations period for each discrete act of discrimination alleged or lose the ability to recover for it." *Lipscomb v. Winter*, 577 F. Supp. 2d 258, 271 (D.D.C. 2008) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–115 (2002)).

The EEOC has promulgated regulations that require a federal employee to first contact an EEO counselor to try to informally resolve the matter, and the employee must do so "within 45 days of the date of the matter alleged to be discriminatory . . . ." 29 C.F.R. § 1614.105(a)(1). After this initial EEO contact, the employee must file an administrative complaint with her agency. *Id.* § 1614.106(a). The agency then conducts an investigation, and—if requested by the employee—the matter is referred to an EEOC administrative judge for a hearing. *Id.* §§ 1614.106(e)(2), 1614.108–09. After the agency investigation, or decision of the EEOC administrative judge, the employing agency must take "final action." *Id.* § 1614.110. At that point an employee may appeal to the EEOC, or file suit in federal court pursuant to 42 U.S.C. § 2000e-16(c). In cases where no "final action" is taken within 180 days after the filing of the charge with the EEOC, an aggrieved federal employee may file a lawsuit in federal court. *Id.*; *Murthy v. Vilsack*, 609 F.3d 460, 464 (D.C. Cir. 2010).

### B. Analysis

The Secretary of the Army, defendant in this case, moves for summary judgment on all of Dr. Beaver's claims, arguing that her denial-of-training claim should be dismissed for failure to exhaust administrative remedies, and that both of her discrimination claims should be dismissed because Dr. Beaver has failed to rebut his proffer that the Army's actions toward Dr. Beaver were taken for a legitimate, non-discriminatory reason. Def.'s Mot. Summ. J. [22-1] 1. Dr. Beaver moves for summary judgment only on her claim for discriminatory denial of training, arguing that the Army has a discriminatory policy of prohibiting English language training to non-native speakers of English. Pl.'s Cross-Mot. Summ. J. [21-1] 2. The Court will discuss these and other arguments in the analysis that follows.

### 1. Count I: Discriminatory Denial of Training

Dr. Beaver's denial-of-training claim will be dismissed for failure to exhaust administrative remedies. Her formal complaint of discrimination, filed with the Department of the Army on March 12, 2008, only raised a single charge of discriminatory termination, even though the form included a "training" box that could have been easily checked-off by the EEO counselor at that time. Def.'s Ex. 18 at 4. Nor does any other part of the complaint suggest that Dr. Beaver intended to bring a claim for discriminatory denial of training. Her explanatory comments in the complaint (where she explained why she believed she was discriminated against) focused exclusively on her termination, saying nothing about training requests. *Id.* at 1–2. Federal law requires an EEO complaint to contain, *inter alia*, a statement "sufficiently precise . . . to describe generally the action(s) or practice(s) that form the basis of the complaint." 29 C.F.R. § 1614.106(c). Even when construed liberally as is required by the D.C. Circuit, *see Adams v. Rice*, 531 F.3d 936, 953 (D.C. Cir. 2008), Dr. Beaver's complaint provides nothing indicating that she believed that defendant's alleged denial of her training requests was

discriminatory, and therefore nothing that put the Secretary on notice that he would have to defend himself against such a claim. Therefore, Dr. Beaver's complaint in this Court contains an unexhausted claim for denial of training.

In response, Dr. Beaver says that the "training" box on her complaint was left unchecked due to the EEO officer's mistake. Pl.'s Mem. Opp'n [24] 33. In a supplementary affidavit—created after she was notified that defendant would challenge Count I of her complaint on exhaustion grounds—Dr. Beaver states for the first time that she "never saw" the last page of the EEO complaint that she signed "[u]ntil the fact-finding conference," Beaver Supp. Decl. [24-10] ¶15, and therefore could not have corrected the alleged error. However, even crediting this suspiciously timed, uncorroborated, and conspicuously self-serving assertion, Dr. Beaver provides no explanation for why she did not amend her complaint to add a denial-of-training claim when she noticed the EEO officer's "error," as she is permitted to do "at any time prior to the conclusion of the investigation." 29 C.F.R. § 1614.106(d). Courts have generally held that when a complainant fails to respond to the EEO officer's framing of the issues in the complaint, the complainant has failed to exhaust his or her administrative remedies with respect to claims not approved by the EEO. *See McKeithan v. Boarman*, No. 11-0086, 2011 WL 3611391, at *3 (D.D.C. Aug. 17, 2011) (collecting cases).

Dr. Beaver also argues that her denial-of-training claim was effectively exhausted because "the claim was investigated" at the agency level, Pl.'s Mem. Opp'n [24] 34, but the evidence cited is inadequate to support her argument. For example, she points to a document that she created and presented to the investigator before the fact-finding conference, in which she refers to the training issue. *Id.* (citing Pl.'s Ex. H [24-8] 1). However, that document, like her EEO complaint, doesn't indicate that she felt that defendant's denial of her request for an extension of her probationary period, so that she could take an English class, was discriminatory

and that she would seek recovery for this allegedly discriminatory act; the document instead focuses upon the grounds for her belief that her *termination* was discriminatory. *See* Pl.'s Ex. H [24-8] 1. It is therefore not a surprise, given Dr. Beaver's complaint and this document, that the investigator's focus during the fact-finding conference was solely on her claim for discriminatory termination, as the transcript of that conference shows: "I'm still here to investigate national origin, why the Complainant was terminated or why she resigned. That's what I want to hear." Def.'s Ex. 19 at 117.

Dr. Beaver is right to the extent that she is arguing that the fact-finding conference touched upon the training topic on at least two occasions. *See id.* at 100, 114. But many topics were touched upon during that conference. Unlike the topic of her termination, none of these topics were discussed as discrete wrongs for which Dr. Beaver sought recovery. While the D.C. Circuit has held that the relevant inquiry concerns "not whether the complainant filed a detailed statement" but whether the actions taken were "adequate to put the [agency] on notice," *Brown v. Marsh*, 777 F.2d 8, 13 (D.C. Cir. 1985) (citations and internal quotation marks omitted), Dr. Beaver has presented no evidence showing that a *claim* for denial of training was actually brought to the agency's attention during the administrative proceeding, either in her formal complaint or in subsequent proceedings. *Id.* These facts compel the conclusion that her claim for discriminatory denial of training must be dismissed for failure to exhaust administrative remedies.

Nor is Dr. Beaver's claim for discriminatory denial of training "like or reasonably related to" the allegation of discriminatory termination in her agency complaint and growing out of that allegation. *See Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995). Given the complete absence of any references to a training claim in her complaint, or any associated facts, such a claim could not arise from the administrative investigation that could "reasonably be expected to

follow the charge of discrimination." *Id.* This conclusion is buttressed by the fact that during the *actual* investigation that followed Dr. Beaver's administrative complaint, as indicated by the materials in the record, the exclusive issue was her claim for discriminatory termination. This also disposes of Dr. Beaver's argument that defendant waived this exhaustion defense, since the Secretary could not be expected to raise any defense to claims that plaintiff did not bring at the agency level. Dr. Beaver has not demonstrated her entitlement to application of this equitable doctrine.

Therefore, for the reasons stated above, defendant's Motion for Summary Judgment will be granted as to Count I of plaintiff's Complaint, and plaintiff's Cross-Motion for Partial Summary Judgment, which moves for summary judgment only as to Count I, will be denied.

### 2.   Count II: Discriminatory Discharge

The Secretary also moves for summary judgment as to Count II of the Complaint, which alleges that defendant discriminated against Dr. Beaver on the basis of her national origin by removing her from federal service without "adequately determining whether her manner of speaking, or her linguistic characteristics, materially interfered with her job performance." Compl. [1] ¶44. In support of his motion, the Secretary has proffered a legitimate, non-discriminatory reason for Dr. Beaver's termination: a series of reports from "a wide variety of employees" indicating that Dr. Beaver had significant difficulties communicating in English "as an instructor, a consultant[,] and a presenter at meetings." Def.'s Mot. Summ. J. [22-1] 25. In sum, the Secretary argues that these basic communication problems, rather than her Chinese national origin, led to Dr. Beaver's dismissal.

Since the Secretary has presented a legitimate, non-discriminatory reason for Dr. Beaver's termination, the D.C. Circuit's decision in *Brady* puts the burden on Dr. Beaver to show the Court evidence that would be sufficient to convince a reasonable jury that the Secretary

is not presenting the actual reason for her termination, and that defendant's actual reason was Dr. Beaver's Chinese national origin. *Brady*, 520 F.3d at 494.

As an initial matter, Dr. Beaver argues that she isn't required to rebut defendant's proffered reason because she has offered "direct evidence of national origin discrimination," Pl.'s Mem. Opp'n [24] 4, and so the D.C. Circuit's decision in *Brady* and the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S 792 (1973) are inapplicable. Instead, she argues—citing a Ninth-Circuit case that is not binding on this Court—that the burden is in fact on the Secretary to prove that Dr. Beaver's language problems materially interfered with her job performance. Pl.'s Mem. Opp'n [24] 2 (citing *Fragrante v. City and County of Honolulu*, 888 F.2d 591 (9th Cir. 1989)). Dr. Beaver further argues that this issue of "materiality" cannot be decided on summary judgment, without citing to any authority. *Id.*

As so-called "direct" evidence of national origin discrimination, Dr. Beaver points to her own testimony, which states that the reason for her termination was her "accent," as well as correspondence from an employee of defendant's human resources department, in which the employee stated that Dr. Beaver's removal would be based upon "language barrier and accent that limit [her] ability to effectively carry out" her duties. Pl.'s Mem. Opp'n [24] 4. However, contrary to Dr. Beaver's assertions, this is not "direct" evidence of discrimination. Evidence of discrimination is "direct" when it would prove such discrimination if believed by the trier of fact. *See Spengler v. Worthington Cyclinders*, 615 F.3d 481, 491 (6th Cir. 2010). However, when evidence requires another inference or a presumption in order to prove discrimination, it is circumstantial. *See Hollins v. Fulton Cty.*, 422 Fed. Appx. 828, 831 (11th Cir. 2011); *see also Thomas v. Nat'l Football League Players Ass'n*, 131 F.3d 198, 204 (D.C. Cir. 1997). It is certainly true that "accent" and national origin are often intertwined, *Fragrante*, 888 F.2d at 596, and the Court is cognizant of the fact that some unethical employers may attempt to conceal their

15

discriminatory actions by referencing purported communication difficulties caused by an employee's accent as the "official" reason for an adverse employment action.  *See* 29 C.F.R. § 1606.6(b).  Here, however, the evidence offered by Dr. Beaver is not direct because a fact finder could not conclude that defendant discriminated against Dr. Beaver without also presuming that defendant's issue was not with *how* Dr. Beaver spoke but with *where* she was from—namely, China.  But a fact finder could also presume otherwise, inferring that defendant's references to Dr. Beaver's "accent" and language difficulties reflected a sincere belief that her English language abilities were simply below what was necessary for her position.  As a consequence, evidence referencing Dr. Beaver's "accent" and "language barrier" as reasons for her termination do not constitute direct evidence of discrimination on the basis of national origin; rather, such evidence is circumstantial.  Therefore, the burden-shifting framework of *McDonnell Douglas*, as simplified by *Brady*, applies.

The cases Dr. Beaver cites for the contrary position—namely, that references to "accent" are direct evidence of discrimination—are inapposite.  *See* Pl.'s Mem. Opp'n [24] 4.  For example, the Eleventh Circuit's decision in *Akouri v. Fla. Dep't of Transp.*, 408 F.3d 1338 (11th Cir. 2005) demonstrates the opposite of what Dr. Beaver contends.  In *Akouri*, the plaintiff was a U.S. citizen, born in Lebanon.  *Id.* at 1342.  While working for the Florida Department of Transportation, he unsuccessfully applied for three promotions, and was told that he was not selected for a supervisory position because the position "supervised white employees, as opposed to black or Hispanic employees, and that [the white employees] would not take orders from him, particularly if he had an accent."  *Id.*  While the word "accent" is admittedly present in this statement, the obvious meaning of it is that the plaintiff was not of the right ethnicity to supervise white employees—a direct statement about his ethnicity or national origin.  Indeed, the Eleventh Circuit, in concluding that the plaintiff had provided "direct" evidence of discrimination, stated

that "only the most blatant remarks, whose intent could mean *nothing other than* to discriminate on the basis of some impermissible factor" constituted direct evidence of discrimination. *Id.* at 1347 (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002)) (emphasis added). It concluded that the plaintiff's evidence was direct because it "blatantly state[d] that the reason [plaintiff] was passed over for the promotion was his ethnicity." *Id.* at 1348. Here, Dr. Beaver's purported "direct" evidence could indicate an intent very different from an intent to discriminate against her on basis of her Chinese national origin. Unlike in *Akouri*, the evidence in this case related to the termination decision makes no mention of her national origin or that of any other DCI employee.

Dr. Beaver argues, alternatively, that she has met her burden under *Brady* and *McDonnell Douglas* because she has called into question "the genuineness of defendant's stated reason for the removal . . . ." Pl.'s Mem. Opp'n [24] 5. In her Opposition, she provides a helpful list of each of her arguments supporting her claim that the Secretary's proffered non-discriminatory reason is a pretext. The Court will now consider, in turn, each of these arguments and the supporting evidence.

### a. Purported paucity of reports of plaintiff's language problems and inadequacy of defendant's investigation

Dr. Beaver argues that defendant's claim that she was terminated because of her problems communicating in the English language is a pretext for discrimination because "Colonel McQueen, whose own interaction with Dr. Beaver was very limited, removed her based upon two isolated complaints that were not investigated." *Id.* at 31. The Court presumes that Dr. Beaver is referring to complaints from Dr. Peterson and Dr. Klote, who complained directly to Colonel McQueen in November and December 2007 about Dr. Beaver's communication problems. *See* Def.'s SMF [22-2] ¶¶26, 33–34. However, Dr. Beaver mischaracterizes these

17

complaints when she calls them "isolated," and she provides no support for her claim that Colonel McQueen's decision to terminate her was based solely upon the complaints of Dr. Peterson and Dr. Klote, or upon an otherwise shoddy investigation.

The Secretary has provided abundant evidence that Colonel McQueen's decision to terminate Dr. Beaver was based on numerous and independent complaints from DCI employees and students in Dr. Beaver's classes, combined with Colonel McQueen's own observation of Dr. Beaver's communication abilities.  The record shows that, in August 2007, Dr. Chang, who reported to Colonel McQueen, concluded that Dr. Beaver's "[a]bility to teach and communicate statistics to investigators" "[n]eeds practical assistance."  Pl.'s SMF [21-10] ¶3.  Dr. Chang's conclusions were confirmed by course evaluations submitted by Dr. Beaver's students, where several students indicated that Dr. Beaver's communication abilities interfered with their ability to learn.  Def.'s SMF [22-2] ¶28.  In November 2007, Colonel McQueen personally attended one of Dr. Beaver's lectures to evaluate her language abilities himself, and he could not understand her.  *Id.* ¶27.

The record also contains evidence that Dr. Beaver's difficulty speaking English was having an adverse effect on her consultation responsibilities.  In October 2007, an investigator told Dr. Chang that she couldn't understand Dr. Beaver, with the result that Dr. Chang had to refer that investigator to another DCI statistician for the consultation that Dr. Beaver's position required her to perform.  *Id.* ¶25.  Dr. Chang received similar reports from other investigators, who reported that they couldn't understand Dr. Beaver.  *Id.* ¶30.  As a result, DCI's only other statistician—Robin Howard—saw her workload increase significantly, as investigators having problems with Dr. Beaver sought consultations with Ms. Howard instead.  *Id.* ¶31.  All of these reports, and Colonel McQueen's direct observation of Dr. Beaver's communication abilities, led

to his decision to terminate her, without even mentioning the complaints from Dr. Peterson and Dr. Klote.

Dr. Beaver likewise mischaracterizes the evidence when she states that "only one of 50 medical researchers with whom Dr. Beaver consulted said that she could not understand her English" and that "only one of 35 students complained that Dr. Beaver's English was difficult to understand." Pl.'s Mem. Opp'n [24] 31. As stated above, defendant has offered evidence showing that Dr. Chang received reports indicating that *multiple* persons in need of consultations with a statistician could not understand Dr. Beaver's English. *See, e.g.*, Def.'s SMF [22-2] ¶¶25, 30, 31. This evidence is corroborated by other persons, including Colonel McQueen and various other doctors, who also could not understand Dr. Beaver. As to Dr. Beaver's student evaluations, there are no student evaluations for Dr. Beaver's July 2007 course, and so nothing can be inferred one way or another. The course evaluations that do exist show that at least four students (more than 20%) stated either that she was a poor speaker, that she was difficult to understand, or that her "accent, at times [] interfer[ed] with my understanding of the information." *Id.* ¶28. Furthermore, these student views are corroborated by other evidence in the record, providing no basis for a reasonable jury to infer that "too few" persons complained for defendant to be actually concerned that Dr. Beaver's communication abilities were below what was required for her job. The number of complaints from various persons, who interacted with Dr. Beaver across the full range of her responsibilities as a statistician, render entirely reasonable defendant's contention that language problems—not national-origin discrimination— led to her termination. *See Beyah*, 666 F. Supp. 2d at 32.

In sum, Dr. Beaver has not provided sufficient evidence of a paucity of complaints, or of a shoddy investigation, to lead a reasonable jury to conclude that the legitimate reason offered by

defendant is only a pretext and that the real reason for her termination was discrimination based on her Chinese national origin.  *See Brady*, 520 F.3d at 494.

### b.  The fact that Dr. Chang could understand Dr. Beaver's English

Dr. Beaver also argues that the fact that her supervisor, Dr. Chang, with whom she interacted on a "daily basis," Pl.'s Mem. Opp'n [24] 31, could understand her English indicates that defendant's asserted justification for her termination is a pretext for discrimination. However, this fact neither suggests that defendant's justification is a pretext, nor that defendant's actual justification was discrimination based on national origin.  Dr. Chang has testified that the fact that she is able to understand Dr. Beaver's English is not because Dr. Beaver's English is adequate for her job, but because Dr. Chang herself speaks Chinese, and so was able to "guess" what Dr. Beaver was trying to communicate in English better than other DCI employees, who did not speak Chinese.  Def.'s Ex. 19 at 148.  Dr. Chang further testified that because both of them spoke Chinese, she overlooked the problems that Dr. Beaver's English-language ability was causing for other DCI employees.  *Id.*  The mere fact that another Chinese-speaking individual, with whom Dr. Beaver "daily" interacted, could "guess" at her meaning is not probative of the adequacy of Dr. Beaver's English-language communication abilities across the full range of her responsibilities.  Defendant is perfectly justified in seeking a level of English-speaking competence in its statistician candidates that rises above a level sufficient for communication with a single, Chinese-speaking supervisor.  While undoubtedly some DCI employees could understand her and some chose to keep their views to themselves, a significant number complained.  As defendant notes, "[t]here is no case law that suggests that [Dr. Beaver's] coworkers had to be uniformly unable to comprehend her."  Def.'s Reply [32] 21.

In sum, the fact that Dr. Chang could understand Dr. Beaver, or even that a subset of employees could understand her while many others could not, could not lead a reasonable jury to

conclude that the Secretary's proffered non-discriminatory justification for Dr. Beaver's termination is a pretext or that he intentionally discriminated against her based on her national origin. *See Brady*, 520 F.3d at 494.

### c. Whether plaintiff's job required that she be able to adequately communicate in English

Dr. Beaver also argues that she has provided "ample evidence" that "verbal communication skills were relatively unimportant to the job" of statistician. Pl.'s Mem. Opp'n [24] 18. As an example of this evidence, she points to an agency evaluation form, which she says lists "communication" last among five performance standards against which her performance was to be measured. *Id.* at 21 (citing Def.'s Ex. 12 at 55). However, Dr. Beaver's characterization of this evidence conspicuously obscures the fact that "communication" is *expressly listed* as a performance standard applicable to her job. This suggests only the *absolute* importance of this ability, not its "relative[] unimportan[ce]." Also, Dr. Beaver's characterization of this evidence requires a false presumption—namely, that the list of standards is ordered by level of importance, which it isn't. This evidence only supports the *contrary* conclusion—namely, that "communication" was of significant importance to Dr. Beaver's statistician position.[3]

She also supports her counterintuitive contention that communicating effectively was "relatively unimportant" in her job with a "functional analysis" of her work. Pl.'s Mem. Opp'n [24] 22. Based on her impression of how many consultations she performed (about 60 each year) and the average duration of such consultations (30 minutes), she estimates that verbal communication was required for "no more than 30 hours," which is "less than 4% of the time" that she spent supporting DCI's researchers. *Id.* She also estimates that, during her attendance at

---

[3] Dr. Beaver also claims (inaccurately) that this "communication" standard does not focus on "the ability to communicate verbally," *id.* at 21–122, but it expressly states that she is expected to provide or exchange "accurate/complete *oral* . . . ideas and information . . . ." Def.'s Ex. 12 at 55 (emphasis added).

nine meetings of the CIC, she spoke "for 15-20 minutes" per meeting, such that only three hours of her time were spent verbally communicating with the members of that committee.  *Id.*  As to classroom teaching, she estimates that only four hours of actual speaking were required.  *Id.* Adding up these discrete instances of verbal communication (and assuming that no other verbal communication was required), Dr. Beaver estimates that a paltry 2% of her time required verbal communication.  *Id.* at 22–23.

Certainly, all things being equal, a task consuming 2% of one's time is much less important than one that occupies 98% of one's time—but the evidence shows that all things are not, in fact, equal.  Dr. Beaver's "functional analysis" disregards the importance placed upon verbal communication by the position description for her job, the standards governing evaluation of her performance, the legitimate expectations of the people who hired and supervised her, as well as other evidence tending to show that effective communication was a very important, and required, skill.  Dr. Beaver's position description requires her to train and educate researchers, to engage in consultations with researchers, and to communicate and interpret statistical results. Def.'s Ex. 16 at 83, 83–84.  One of the express performance standards by which she was to be judged was "communication."  Def.'s Ex. 12 at 55.  The student evaluation forms for Dr. Beaver's November 2007 course expressly asked her students to rate her effectiveness as a speaker.  *See, e.g.*, Def.'s Ex. 10 at 39.  The competency assessment form for her position expressly asked her supervisor to rate her "[a]bility to teach and communicate."  Def.'s Ex. 11 at 53.  Colonel McQueen, Dr. Beaver's second-level supervisor, testified that Dr. Beaver's position "required effective communication."  Def.'s Ex. 19 at 120.  And so on.

Certainly firing someone for failing to do something that he or she was not required to do could raise suspicions that reasons other than job performance were at work, but Dr. Beaver has presented no evidence tending to show that the ability to communicate effectively in English

wasn't required.  As such, she has not produced sufficient evidence for a reasonable jury to find

that defendant's proffered and legitimate reason for her termination was a pretext or that

defendant intentionally discriminated against her on the basis of her national origin.  *See Brady*,

520 F.3d at 494.

### d.   Allegedly inconsistent job evaluations

Dr. Beaver also argues that the fact that she "received" a favorable job evaluation only

three months before she was terminated is evidence of pretext.  Pl.'s Mem. Opp'n [24] 31.

However, that favorable evaluation of her work, while apparently "received" in September 2007,

evaluated her job performance for the first half of her probationary period, up to and including

July 31, 2007.  Pl.'s Ex. C [24-3] 1.  The competency assessment she received the very next

month, by contrast, stated that she needed "practical assistance" with respect to her "[a]bility to

teach and communicate statistics to investigators."  Pl.'s SMF [21-10] ¶3.  Therefore, while Dr.

Beaver was rated favorably early on, she received a less favorable review for a later period, in a

review that specifically identified problems with her communication and teaching abilities.  As

such, this timing provides no basis for a reasonable jury to infer that defendant's proffered reason

for Dr. Beaver's termination—*i.e.*, communication difficulties—was a pretext or that defendant

intentionally discriminated against her on the basis of her national origin.  *See Brady*, 520 F.3d at

494.

Dr. Beaver also argues that defendant offered a "demonstrably false" explanation for her

apparently positive review for the first half of her probationary period, and that this suggests

pretext.  Pl.'s Mem. Opp'n [24] 31.  Turning to that review, on the second page it contains five

possible performance ratings with the following descriptors: (1) "Excellence, 75% or More

Obj[ectives]; (2) "Excellence, 25–74% Obj[ectives]"; (3) "Success All or Excellence, 1–24%

Obj[ectives]"; (4) "Needs Improvement, 1 or More Obj[ectives]"; and (5) "Fails 1 or More

Obj[ectives]."  Pl.'s Ex. C [24-3] 2.  Dr. Chang rated Dr. Beaver's performance to be the second

highest: "Excellence, 25–74% Obj[ectives]."  *Id.*  However, at the fact-finding conference,

Colonel McQueen testified that this "would not be seen as a particularly promising evaluation."

Def.'s Ex. 19 at 122.  Dr. Beaver says that this testimony is "demonstrably false," but she does

not demonstrate that it is false.  As is appropriate on summary judgment, the Court gives Dr.

Beaver the benefit of an inference that her rating was a good rating even within DCI; indeed, it is

hard to see how a rating dubbed "excellence" could constitute anything other than a very positive

rating.   But, even with the benefit of this inference, this apparent inconsistency between her

rating in that evaluation and Colonel McQueen's characterization of it in his testimony is simply

not probative of the key issue: defendant's thinking when it came to determining that Dr. Beaver

should be terminated.   Dr. Beaver cannot avoid summary judgment just by pointing to some

apparent inconsistency between the testimony of a defense witness and other evidence; she must

show that this specific inconsistency could give rise to a reasonable inference that defendant's

proffered non-discriminatory reason for her termination was a pretext and that she was

discriminated against on the basis of her national origin.  *See Hayes v. Sebelius*, 762 F. Supp. 2d

90, 107 (D.D.C. 2011); *see also Brady*, 520 F.3d at 494.  This isolated inconsistency, particularly

in light of the substantial support in the record for defendant's contention that Dr. Beaver's

problems communicating in English—and not her national origin—formed the basis for her

termination, is insufficient for Dr. Beaver to avoid summary judgment.

> ### e.  Defendant's alleged failure to provide plaintiff with notice that her communication difficulties could lead to termination

Dr. Beaver also claims that a reasonable jury could infer pretext and intentional

discrimination because "before January 4, 2008, no one at the agency informed [her] that

deficient communication skills threatened her continued employment." Pl.'s Mem. Opp'n [24] 31. Once again, Dr. Beaver fails to meet her burden.

As an initial matter, the record indicates that Dr. Beaver knew well in advance of her termination that her communication skills were a problem. She disclosed this knowledge as early as July 2007, when she e-mailed Dr. Chang and stated that she was practicing her statistics course in advance with another DCI employee because her main concern was her English pronunciation. Def.'s SMF [22-2] ¶18. Dr. Beaver also testified that she received the student evaluations for her November 2007 course, which included several evaluations critical of her communication ability, that same month. Def.'s Ex. 19 at 104. This, and other, evidence in the record suggests that January 4, 2008 was not the first time Dr. Beaver heard anything regarding her difficulty communicating in English and that she had been fully aware of the problem for months. Dr. Beaver, based on the evidence this Court has seen, is correct that she did not receive a specific warning before January 2008 indicating that her continued employment with DCI was contingent on improving her English; however, the evidence indicates that she knew it was a problem, and she should have known that underperforming in any required area could affect her prospects for permanent status with DCI. Also, since Colonel McQueen did not begin an investigation concerning Dr. Beaver's communication abilities until November 2007, only a few months before her probationary period would end, defendant's apparent delay in directly confronting Dr. Beaver about her communication problems is not suspicious, and provides no basis for a reasonable jury to believe that some reason *other than* her communication problems in fact motivated the termination decision, or that this "other" reason was prohibited discrimination. *See Brady*, 520 F.3d at 494.

Dr. Beaver also argues that a reasonable jury could find pretext based on defendant's alleged failure to follow its own rules and practices by not providing Dr. Beaver with adequate

notice of her performance deficiencies and by providing her with an opportunity to correct those deficiencies.  Pl.'s Mem. Opp'n [24] 32.  As far as her contention that defendant was required to extend her probationary period so that she could improve her English, the relevant regulations indicate the contrary, as is discussed below.  Regarding the notice Dr. Beaver alleges that she was entitled to receive, she points to no rules, regulations, or other laws that defendant allegedly violated, and does not explain how any such inconsistencies could lead a reasonable jury to conclude that defendant's proffered non-discriminatory reason for her termination was a pretext and that it intentionally discriminated against her.

> **f.  Defendant's refusal to extend plaintiff's probationary period and to provide her with English-language training**

Dr. Beaver argues that defendant's refusal, in January 2008, to extend her probationary period and failure to train her to speak English at the required level of proficiency could convince a reasonable jury that defendant's proffered non-discriminatory reason is a pretext and that defendant in fact intentionally discriminated against her based on her national origin.  Pl.'s Mem. Opp'n [24] 32.  However, Dr. Beaver has failed to demonstrate that the applicable regulations permitted an extension; that, if such an extension were available, she was eligible for it; or that others similarly situated to her received such an extension.  Defendant cites to authority indicating that Colonel McQueen lacked the power to extend Dr. Beaver's probationary period. *See* Def.'s Mot. Summ. J. [22-1] 22.  Civil service regulations state that the "probationary period required by § 315.801 is 1 year *and may not be extended.*"  5 C.F.R. § 315.802 (emphasis added).  Dr. Beaver argues that defendant is misreading the relevant National Security Pay System regulations, citing to a rule that she claims gives defendant "discretion" to extend her probation period "up to an additional two years."  Pl.'s Mem. Opp'n [24] 36 (citing former 5

C.F.R. § 9901.512(a).[4]   However, the Court finds no support for Dr. Beaver's interpretation in the language of the regulation.   It states clearly that the Secretary "may establish initial probationary periods of at least 1 year, but not to exceed 3 years . . . ." *See* former 5 C.F.R. § 9901.512(a).   This language says nothing about the authority of supervisors to *extend* probationary periods already set by the Secretary.   Even the Secretary's discretion to set longer probationary periods is limited to "*categories of positions* or *types of work* that require a longer time period to evaluate the employee's ability to perform the work."   *Id.* (emphasis added). Thus, contrary to Dr. Beaver's interpretation, no consideration of an individual employee's circumstances is referenced in the applicable regulations.

In sum, Dr. Beaver has provided no argument or evidence challenging defendant's appraisal of its options following her request for an extension, and the regulatory restrictions that defendant points to corroborate Colonel McQueen's testimony that he did not extend her probationary period because he believed he lacked the authority to do so.   *See* Def.'s Ex. 19 at 128–29.

### g.   Alleged dissent of defendant's human resources department regarding the termination decision

Dr. Beaver also claims that a reasonable jury could conclude that her difficulty communicating in English was not the real reason for her termination because "the agency's own HR representatives seriously questioned the legitimacy of removal."  Pl.'s Mem. Opp'n [24] 32. Again, plaintiff mischaracterizes the evidence.   As to an e-mail chain, summarized in her Opposition, *id.* at 12–13, in which human-resources personnel discussed issues related to her communication problems, no reasonable jury could interpret that e-mail to represent evidence that human-resources employees "seriously questioned the legitimacy of removal" or that any of

---

[4] Dr. Beaver actually cites to 5 C.F.R. § 9901.412(a), not § 9901.512(a), but since the section she cites does not concern probationary employees, the Court assumes Dr. Beaver's citation is a typographical error.

those employees opposed Colonel McQueen's decision.   Likewise, Dr. Beaver cherry-picks a couple of sentences from an e-mail written by human-resources employee Ervin Henderson in a manner that obscures the fact that, in asking for changes to a paragraph in a termination memorandum, Mr. Henderson was not "seriously questioning the legitimacy of removal" but simply proposing improvements to the termination letter.   *See* Pl.'s Ex. F [24-6] 1.   In short, Dr. Beaver's claim of human-resources opposition to her termination is wholly without foundation in the record.

## IV.    CONCLUSION

In summary, plaintiff's claim for discriminatory denial of training will be dismissed for failure to exhaust administrative remedies, and her claim for discriminatory termination will be dismissed for failure to produce sufficient evidence for a reasonable jury to find that defendant's asserted non-discriminatory reason was not the actual reason and that it intentionally discriminated against her on the basis of national origin.   *See Brady*, 520 F.3d at 494.   Therefore, the Court will grant defendant's Motion [22] for Summary Judgment and deny plaintiff's Cross-Motion [21] for Summary Judgment.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on January 9, 2012.